UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **UNITED STATES OF AMERICA**<br><br>v.<br><br>**DEANDRE DAVIS,**<br><br>Defendant. | **Case No. 25-cr-170 (ACR)** |

**OPPOSITION TO DEFENDANT'S MOTION TO SUPRESS TANGIBLE EVIDENCE**

    The United States of America, by and through the United States Attorney for the District of Columbia and undersigned counsels, respectfully submits this opposition to Defendant's "Motion to Suppress Tangible Evidence" (ECF No. 27) (hereinafter "Def. Mot."). On May 19, 2025, Deandre Davis illegally possessed a loaded ghost gun, with one round of ammunition in the chamber and an additional six rounds in the magazine. Officers from the Metropolitan Police Department's ("MPD") Robbery Suppression Unit ("RSU") conducted a stop based on probable cause that Mr. Davis, along with two other individuals, were smoking marijuana in public, in violation of D.C. Code § 48-911.01, an arrestable offense. RSU investigators saw Mr. Davis smoke what they believed to be a marijuana cigarette in an area they knew had a high rate of violent crime and drug-related offenses. Because investigators fully complied with the protections afforded by the Fourth Amendment of the Constitution when they searched Mr. Davis incident to a valid probable cause arrest, the Defendant's motion should be denied.

**FACTUAL BACKGROUND**

    On Monday, May 19, 2025, around 7:33 p.m., members of the RSU were traveling west near the 2100 block of Alabama Avenue Southeast, Washington D.C., in an unmarked car, when they observed Mr. Davis actively smoking with two other individuals in front of a storefront.

1



*Figure 1 Davis (circled in red) smoking, Individual 2 (in green) Individual 3 (in yellow)*

They observed the cigarette emit a cloud of white smoke. Based on their training and experience, RSU members believed the smoke to be consistent with burnt marijuana. RSU members observed Mr. Davis hand the marijuana cigarette to Individual 2, who drew a puff before passing it to Individual 3.



*Figure 2 Davis handing Individual 2 the marijuana cigarette*



*Figure 3 Individuals 2 and 3 sharing the marijuana cigarette*

After making these observations, RSU members immediately made a U-turn and parked the vehicle on the street closest to where Mr. Davis and the two individuals stood. They exited their vehicle and walked towards the Defendant and the other two individuals. As they approached, RSU members were able to smell the distinct odor of burnt marijuana. Simultaneously, Mr. Davis begins to separate himself from the other two individuals. RSU members who observed Mr. Davis smoking knew that individuals in possession of illegal contraband frequently separate themselves from groups of individuals upon noticing the presence of the police.



*Figure 4 Davis turned away from the group and separating himself upon seeing police (blue)*

MPD Investigator Harvey Hinostroza approached Mr. Davis and said "Hey what's up fellas, how you doing? Just chill," and then asked, "You got your ID with you?" Unprompted, Mr. Davis volunteered, "I wasn't smoking, I wasn't smoking, sir. I was not smoking." Importantly, Investigator Hinostroza had not asked about, nor mentioned anything about smoking prior to approaching Mr. Davis. Investigator Hinostroza then asked Mr. Davis for his identification again, but Mr. Davis could not produce it. During this interaction, Mr. Davis acted nervously, by moving away from Investigator Hinostroza and constantly looking around and behind Investigator Hinostroza. Mr. Davis then placed his left hand in his pocket, which prompted Investigator Hinostroza to grab Mr. Davis's arm. At that point, Mr. Davis began resisting Investigator Hinostroza. More RSU officers approached and aided in Mr. Davis's detention. Mr. Davis began to resist more strenuously, by tensing up, bending over, and trying to break free from the investigators' hold.

Eventually, law enforcement subdued and searched Mr. Davis incident to arrest. RSU Investigator Rony Desir felt a hard, L-shaped object in Mr. Davis's groin area. RSU members

lifted his hoodie and pulled his pants, which included two layers of compression shorts. They observed the baseplate of a magazine stamped with the "Amend2 logo," which appeared to be inserted into the handle of a firearm tucked in Mr. Davis's groin area.



*Figure 5 – Photograph of Firearm Recovered from the Defendant*

RSU members photographed their observations and recovered a black semi-automatic firearm from Mr. Davis's person.



*Figure 6 – Firearm Recovery*

The firearm was determined to be a black Polymer 80 9mm semi-automatic pistol with no serial number, and it further appeared to be a privately manufactured firearm, otherwise known as a "ghost gun." The firearm was loaded with one bullet in the chamber and an additional 6 rounds of ammunition in the magazine.

Once law enforcement secured Mr. Davis and the other two individuals, they began searching the aera for the discarded marijuana cigarette. At one point, Investigator Hinostroza asks Investigator Desir, "Hey, you got that J?" Later, Investigator Desir asks Investigator Augustus Thomas, "Did he have a J in there?" Throughout the body worn camera footage, law enforcement can be seen looking at the ground searching for the discarded marijuana cigarette. During a search incident to arrest, law enforcement recovered white rolling paper lined with THC wax, a lighter, a smaller baggie containing a green leafy substance, and over $200 in U.S. currency from Individual 2 and approximately 2.2 ounces of a green leafy substance, which tested positive for synthetic canibanoids, individual plastic baggies, and $99 in U.S. currency from Individual 3.

## LEGAL STANDARD

"When an arrest is made, it is reasonable for the arresting officer to search the person arrested in order to remove any weapons that the latter might seek to use in order to resist arrest or effect his escape." *Chimel v. California*, 395 U.S. 752, 762-63 (1969). To make an arrest, an officer must have probable cause that the defendant committed an arrestable offense. *United States v. Freeman*, 360 F. Supp. 2d 43, 47-48 (D.D.C. 2003). "[P]robable cause does not require an absolute certainty, 'only a probability or substantial chance' that a crime was committed." *Id*. (citing *Illinois v. Gates*, 462 U.S. 213, 243-44 n. 13 (1983). Indeed, "[a]n officer may arrest an individual without violating the Fourth Amendment if there is probable cause to believe that the offender has committed even a *very minor* criminal offense in the officer's presence." *Atwater v. City of Lago Vista*, 532 U.S. 318, 322 (2001) (emphasis added). To determine whether an officer had probable

cause for an arrest, "[courts] examine the events leading up to the arrest, and then decide whether these historical facts, viewed from the standpoint of an objectively reasonable police officer, amount to probable cause." *Maryland v. Pringle*, 540 U. S. 366, 371 (2003) (internal quotations omitted); *cf Smith v. United States*, 121 F. Supp. 3d 112, 120 (D.D.C. 2015) (J. Brown-Jackson) ("the test for determining whether or not the police had sufficient information and a reasonable belief that the suspect had committed a crime is dependent entirely on the facts as they actually occurred—*i.e.,* on the objective facts—without regard to what a police officer may have actually, even reasonably, perceived the facts to be.") (cleaned up).

"Although the Fourth Amendment generally requires that officers have probable cause and a warrant to seize an individual, they need neither probable cause nor a warrant to briefly detain a citizen where they have a reasonable, articulable suspicion that 'criminal activity may be afoot.'" *United States v. Delaney*, 955 F.3d 1077, 1080 (D.C. Cir. 2020) (quoting *Terry v. Ohio*, 392 U.S. 1, 30, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968) (cleaned up); *see also United States v. Edmonds*, 240 F.3d 55, 59 (D.C. Cir. 2001). An officer "may stop a citizen if they are 'able to point to specific and articulable facts which, taken together with rational inferences from those facts, support a reasonable and articulable suspicion that the person seized is engaged in criminal activity.'" *Delaney*, 955 F.3d at 1081. "Under *Terry* and its progeny, a police officer may perform a protective frisk if he has reason to believe, based on specific and articulable facts ... taken together with rational inferences from those facts, that he is dealing with an armed and dangerous individual." *United States v. Holmes*, 385 F.3d 786, 789 (D.C. Cir. 2004) (upholding officer's *Terry* search as reasonable) (internal quotations omitted). Importantly, the constitutional reasonableness of a *Terry* stop does not depend on the actual motivations of the officers involved. *Whren v. United States*, 517 U.S. 806, 813-14 (1996); *see also United States v. Person*, 754 F. Supp. 3d 231, 251 (D.D.C. 2024) (J. Moss) ("It is well settled, however, that Fourth Amendment

7

challenges cannot be 'based on the actual motivations of individual officers' and that even pretextual reasons for a stop can form a proper basis for reasonable suspicion.") (quoting *Whren*).

## ARGUMENT

**I.    The Search of Defendant Davis Was Permissible Incident to Arrest for Publicly Smoking Marijuana.**

RSU investigators had probable cause to arrest Mr. Davis after observing him smoke a rolled, lit cigarette emitting distinct, thick, white smoke on a public sidewalk, which the investigators later confirmed was marijuana after smelling its distinct odor upon approach of Mr. Davis. Pursuant to 48 D.C. Code, Section 911.01, "it is unlawful for any person to smoke or otherwise consume marijuana in or upon a public space, or in or upon any of the following places," such as a "street, alley, park, sidewalk, or parking area." Anyone who violates this section "shall be punished by a fine of . . . or imprisoned for not more than 60 days." Relatedly, D.C. Code, Section 581 specifies the situations under which an MPD officer may make a warrantless arrest. With respect to misdemeanor offenses, such as smoking marijuana in public, an officer can arrest an individual if they have probable cause to believe an offense has been committed *and* the offense was committed in the officer's presence. 23 D.C. Code Section, 581(a)(1)(B). Smoking marijuana in public is a misdemeanor offense. Because these officers had probable cause to believe that Mr. Davis was consuming marijuana in public and in their presence, they could arrest him.

Probable cause "requires only a probability or substantial chance of criminal activity, not an actual showing of such activity." *Illinois v. Gates*, 462 U.S. 213, 243-44 (1983). Nor is probable cause "a high bar," but "requires only the kind of fair probability on which reasonable and prudent people, not legal technicians, act." *Kaley v. United States*, 571 U.S. 320, 338 (2014) (internal quotations omitted). To determine whether an officer had probable cause for an arrest, "[courts] examine the events leading up to the arrest, and then decide whether these historical facts,

viewed from the standpoint of an objectively reasonable police officer, amount to probable cause." *Maryland v. Pringle*, 540 U. S. 366, 371 (2003) (internal quotations omitted). Put simply, if these investigators observed Mr. Davis smoking marijuana on the sidewalk or parking area in front of Eddie's Laundromat, they could arrest him. *See United States v. Lea*, 839 F. App'x 551, 553 (D.C. Cir. 2020) (finding that officers were entitled to search incident arrest an individual who informed them he was smoking "[s]ome weed" for violating D.C. Code § 48-911.01).

Here, the undisputed evidence—captured on video—is that Mr. Davis and his compatriots were smoking. Indeed, the video shows Mr. Davis taking two pulls on the marijuana cigarette in his hand before handing it to Individual 2, who then huddles with Individual 3. According to investigators, both Individual 2 and 3 took pulls off the marijuana cigarette. RSU also recovered illicit narcotics and smoking paraphernalia upon the arrest and search of Individuals 2 and 3, including a small amount of a synthetic cannabinoid, rolling papers lined with THC wax, and a lighter on Individual 2, as well as over two ounces of a synthetic cannabinoid on Individual 3, confirming what the investigators saw. Combined with the odor of freshly burnt marijuana described by the investigators, Mr. Davis's unprompted and self-serving denial that he smoked anything, the investigators' real-time statements detailing what they saw, and the efforts to search for the discarded marijuana cigarette, the Court has more than enough evidence to find that the "objective facts" here demonstrate that Mr. Davis was smoking marijuana in public.

These types of observations have repeatedly been recognized as sufficient to support probable cause for arrest. *See, e.g. Bulter v. United States*, 102 A.2d 736, 741-72 (D.C. 2016) (officer had probable cause to arrest the defendant for unlawfully possessing marijuana where officer smelled "fresh" marijuana emanating from the vehicle the defendant occupied alone during a traffic stop); *United States v. Walters*, 361 Fed. Appx. 153, 154 (D.C. Cir. 2009) (holding that

9

officers had probable cause to believe that the defendant unlawfully possessed marijuana upon finding marijuana and a lighter in appellant's jacket during a lawful traffic stop); *cf. United States v. Sheffield*, 832 F.3d 296, 305 (D.C. Cir. 2016) (the smell of marijuana, in conjunction with other evidence of drug use, provided probable cause to believe the vehicle contained drug contraband, which in turn supported a search of the car's compartments); *United States v. Turner*, 119 F.3d 18, 20 (D.C. Cir. 1997) (finding probable cause to search vehicle when there was the "smell of burnt marijuana emanating from the car, the pieces of torn cigar paper arrayed around [the defendant], and the zip lock bag of green weed material found on the floor behind his seat.").

The only remaining question for the Court is whether investigators actually saw Mr. Davis and the other individuals smoking a marijuana cigarette. This, too, is easy for the Court to answer in the affirmative. Not only do Investigators Hinostroza and Desir tell Mr. Davis and the other individuals that they witnessed them smoking in real time on body worn camera, the video from an MPD crime camera across the street confirms that Mr. Davis *was in fact smoking*. The government anticipates both Investigator Hinostroza and Desir to testify that while they were patrolling on Alabama Avenue, they observed Mr. Davis and two other individuals smoking. The investigators will testify that they drive by that area frequently while on patrol and know that storefront to be a common place for "quality of life crimes," including public consumption of alcohol and marijuana. Additionally, the investigators are familiar with the area around 2105 Alabama Avenue SE because of multiple prior arrests for consumption of marijuana in public and illegal possession of firearms.

The investigators' actions immediately following Mr. Davis's arrest further support their observations. Investigator Desir asked another RSU member whether they found "a J" in the area. Around the same time, body worn camera shows Investigator Hinostroza searching the ground for

10

the discarded marijuana cigarette. Other RSU members appeared to check the area where Mr. Davis had been smoking. Given the small size and fragile nature of a lit marijuana cigarette—a smoldering combination of paper and dried plant material— it is not surprising that the marijuana cigarette was not found, especially given Mr. Davis's resistance during the arrest. *See United States v. Lea*, 839 F. App'x 551, 556 (D.C. Cir. 2020) (rejecting claim that officers could not find marijuana cigarette was incredible because "[r]easons for the cigarette's disappearance are not hard to conjure; for instance, . . . it could have blown away").

Indeed, while RSU members are attempting to subdue and arrest Mr. Davis, Individual 2 is moving freely about the area and throws out a white object into a nearby trash bin.



*Figure 7 - Individual 2 throwing out an object (yellow) during Mr. Davis's arrest (red)*

Mr. Davis questions whether Investigators Hinostroza and Desir "could see what they said they could see.," ECF No. 27 at 3, but offers no explanation for how the description given by Investigator Hinostroza in the arrest affidavit matches up *exactly* with the recovered crime camera video that shows the seconds leading up to their interaction with Mr. Davis. The Court is left with only two scenarios: that Investigator Hinostroza made up the entire interaction that he said he witnessed, which just happens to match up with the video, or that he saw what he said he saw.

11

Because Investigators Hinostroza and Desir observed Mr. Davis committing an offense in their presence, they had probable cause to arrest and search him incident to arrest. *See United States v. Bookhardt*, 277 F.3d 558, 564 (D.C. Cir. 2002) ("The validity of a search [incident to arrest] depends on the lawfulness of the arrest, which in turn requires probable cause to believe that a crime has been committed.") (citing *United States v. Christian*, 187 F.3d 663, 667 (D.C. Cir. 1999)).

## II. In the Alternative, Investigators Hinostroza and Desir Had Reasonable Articulable Suspicion to Frisk Defendant Davis.

Even if the Court were to find that these investigators did not have probable cause to arrest Mr. Davis, and therefore search him, at the very least they had reasonable suspicion to justify a *Terry* stop and search. *See United States v. Terry*, 392 U.S. 1 (1968). Under *Terry*, "the police can stop and briefly detain a person for investigative purposes if the officer has a reasonable suspicion supported by articulable facts that criminal activity 'may be afoot.'" *United States v. Sokolow*, 490 U.S. 1, 7 (1989) (quoting *Terry*, 392 U.S. at 30).

In *United States v. Lea*, the D.C. Circuit found reasonable suspicion on markedly similar facts. 839 F. App'x at 554. There, officers smelled marijuana emanating from the defendant's vicinity and observed him "sitting alone smoking a hand-rolled cigarette." *Id.* The Circuit found that these observations "were sufficient to detain [the defendant] briefly in order to investigate a possible violation of D.C. Code § 48-911.01." *Id.* The same is true here. Investigators Hinostroza and Desir observed Mr. Davis smoking what appeared to be a marijuana cigarette. Specifically, they observed distinct, thick, white smoke emanating from the item that the individuals, including Mr. Davis, were smoking. When investigators exited their vehicle, they detected an odor consistent with burnt marijuana.

Further supporting their suspicion of Mr. Davis, upon seeing law enforcement, he tried to

12

immediately separate himself from the group and headed for the only avenue of escape available to him. These observations provided the investigators with sufficient grounds to conduct a brief investigatory stop of Mr. Davis. Once Investigator Hinostroza began speaking to Mr. Davis, he noticed Mr. Davis acting nervously, volunteering information not asked for (i.e., "I wasn't smoking"), backing away from Investigator Hinostroza, blading his body, looking off to the side while trying to delay finding his identification, and finally, reaching into his pocket after he already told Investigator Hinostroza he did not have his identification on him. Investigator Hinostroza then grabbed Mr. Davis's arm, at which point Mr. Davis became uncooperative and tried to break free from his grip. *See United States v. Taylor*, 743 F. Supp. 3d 168, 175-76 (D.D.C. 2024) (J. Moss) (finding officer's testimony of "blading" and "standing unnaturally" to contribute to reasonable suspicion).

Mr. Davis's "response in seeing the officers approach him only added to the officers' reasonable suspicion." *United States v. Butler*, No. 20 CR 630 2021 WL 5881680 at *3 (N.D. Ill. Dec. 13, 2021). Unlike the other two individuals, Mr. Davis immediately started walking away when he saw law enforcement approach and exit their vehicle. While Mr. Davis's conduct may not be "necessarily indicative of wrongdoing" on its own, "it is certainly suggestive of such." *See Illinois v. Wardlow*, 528 U.S. 119, 124 (2000) ("nervous, evasive behavior" supports reasonable suspicion of criminal activity); *United States v. Brown*, 334 F.3d 1161, 1167–68 (D.C. Cir. 2003) (well-settled that furtive movements may be grounds for reasonable suspicion); *United States v. Belin*, 868 F.3d 43, 51 (1st Cir. 2017) (change in demeanor indicating nervousness contributed to reasonable suspicion that defendant was armed and dangerous) (citing *United States v. Arnott*, 758 F.3d 40, 15 45 (1st Cir. 2014) (nervousness relevant to reasonable suspicion that defendant was armed and dangerous)).

At this point, Investigator Hinostroza will testify that he became concerned because Mr.

13

Davis did not have a valid reason for reaching into his pocket and tried to break free from his grip. This, combined with his training and experience with individuals armed with illegal weapons, made him believe Mr. Davis was armed. *Minnesota v. Dickerson*, 508 U.S. 366, 373 (1993) ("[A]n officer is justified in believing that the individual whose suspicious behavior he is investigating at close range is armed and presently dangerous. . . the officer may conduct a pat down search to determine whether the person is in fact carrying a weapon.") (internal quotations omitted). Due to that reasonable belief, Investigator Hinostroza and the members of the RSU had a justification under *Terry* and its progeny to conduct a brief protective pat down. During that pat down, Investigator Desir immediately felt a hard, L-shaped object near Mr. Davis's groin and gave the code word the RSU used for the discovery of a firearm. They also recovered controlled substances and drug paraphernalia from the other individuals with Mr. Davis.

Mr. Davis's suggestion that RSU investigators "routinely use public consumption of potentially legal substances as pretextual reasons for illegal searches and seizures…" (Def Mot. ECF No. 27 at 2) is both factually baseless and misstates the law. First, consuming marijuana in public is an arrestable crime in the District of Columbia. Further, the courts, including the Supreme Court, have repeatedly affirmed "that even pretextual reasons for a stop can form a proper basis for reasonable suspicion." *Person* 754 F. Supp. 3d at 251; *see also Whren*, 517 U.S. 813-14. Therefore, the investigators had a valid basis for stopping and searching Mr. Davis.

## **CONCLUSION**

The Court should deny Mr. Davis's motion to suppress the firearm found on his person because Investigators Hinostroza and Desir personally witnessed Mr. Davis, and two other individuals smoke a marijuana cigarette on May 19, 2025. They witnessed Mr. Davis take a hit and expel a distinct white cloud of smoke before passing the marijuana cigarette onto the other individuals. When they stopped to investigate, they smelled freshly burnt marijuana. Based on

14

these facts *alone* they had probable cause to arrest Mr. Davis and conduct a search incident to that arrest. The Court should credit the investigators presumed testimony because Mr. Davis was captured on video smoking and passing the object around to the other two individuals, who were both found with smoking paraphernalia when they were searched. Even if the Court does not find that the investigators had probable cause for an arrest, the government has also met the burden to show they had reasonable articulable suspicion to conduct a *Terry* stop and subsequent protective pat down to search for weapons. Accordingly, this Court should deny the defendant's motion.

        Respectfully submitted,

        Jeanine Ferris Pirro
        United States Attorney

By:    */s/ Kyle M. McWaters*
        Kyle M. McWaters
        D.C. Bar No. 241625
        Sabena Auyeung
        IL Bar No: 6317842
        Assistant United States Attorneys
        601 D Street NW
        Washington, DC 20530
        (202) 252-6983
        kyle.mcwaters@usdoj.gov
        202-803-1622
        Sabena.Auyeung@usdoj.gov