# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA :

                   :

         v.                          1:25-cr-170 (ACR)

                   :

DEANDRE DAVIS              :

## DEFENDANT'S SUPPLEMENT TO HIS MOTION TO SUPPRESS TANGIBLE EVIDENCE

Mr. Deandre Davis, the defendant, through undersigned counsel, pursuant to the Fourth Amendment to the United States Constitution, respectfully supplements his Motion to Suppress.

## INTRODUCTION

The government's brief gets both the facts and the law wrong. For example, the government asserts that the Court is required "to give deference to the testimony of [the officer] witnesses unless it is 'exceedingly improbable testimony" unless there is "empirical evidence contradicts the testimony," "the officer's credibility is so impugned as to require exclusion of his testimony" and the "officer's account are numerous and bear directly on the contested issue." ECF No. 40 at 5 (quoting *United States v. Delaney,* 651 F.3d 15, 18 (D.C. Cir. 2011)). This is a patently incorrect statement of law. That is the standard the Court of Appeals applies when reviewing the district court's factual findings for clear error after that district court has chosen to credit a witness's testimony. *Delaney,* 651 F.3d at 18 ("[T]he district court's credibility determination is "'entitled to the greatest deference from this court on appeal.'"). It is not the standard that the district court is to use in the first instance. And, notably, a witness's "testimony is *not* afforded greater weight because he is a law enforcement officer." *United States v. Gibson*,

366 F. Supp. 3d 14, 27 (D.D.C. 2018) (emphasis added).  Though it may be the U.S. Attorney's Office's practice to give police officers every benefit of every doubt before questioning their credibility, that is not the proper standard for district courts.  Instead, this Court is required to consider evidence, science, and common sense.  After doing so, the Court has no choice but to suppress the firearm recovered in this case.

### Factual Background

Mr. Davis is charged in a one-count indictment with unlawful possession of a firearm by a person convicted of a crime punishable by imprisonment for a term exceeding one year, in violation of 18 U.S.C. § 922(g)(1).  The charge arose out of an incident that occurred on May 19, 2025.

On July 30, 2025, Investigator Harvey Hinostroza testified to his involvement arresting Mr. Davis in front of the Eddie Leonard's carryout at the intersection of Alabama Avenue and Bruce Place SE.

Hinistroza was a passenger in an unmarked police car with the Robbery Crime Suppression Team.  He was riding alongside Investigator Rony Desir, who was driving the car. Hinistroza testified that while riding down Alabama Avenue, he saw Mr. Davis standing with two other individuals.  He saw "an individual smoking a joint." Tr. 7/30/25 at 11.  He described three men, standing around puffing and passing what he assumed was a joint of marijuana.  The officers initiated a stop and are claiming that they at that point intended to arrest.

Hinistroza purported to identify the cigarette as a marijuana cigarette based on the smoke from about 30 yards, or about the "length of a recreational pool,"[1] away. According to Hinistroza, "marijuana has the specific burn.  And when somebody takes a puff of the marijuana

---

[1] The defense anticipates presenting testimony that the actual distance is closer to 80 yards.

you can see a big white cloud of smoke, which a cigarette cannot make, which crack cannot make, or any additional narcotic cannot make the specific white cloud coming out." Tr. 7/30/25 11. The officer further explained, "[w]hen you smoke marijuana, the white smoke is heavier, it's thicker, and it has a better consistency in the air."[2] Tr. 7/30/25 at 12.

Investigator Hinistroza also testified that he could tell that the cigarette was white and the size of a regular joint, Tr. 7/30/25 at 134, and from "probably could be 30 yards." Tr. 7/30/25 at 137. He also claimed to observe that there was no filter on it. Tr. 7/30/25 at 134.

Even though Investigator Hinistroza could purportedly see all this cleary from a pool's length away, things were not so clear when he got close to Mr. Davis. Hinistroza testified that he and his fellow officers could not find this joint despite looking for it. Hinistroza further testified that, to arrest someone for a drug related offense, a field test is required to establish by probable cause that the substance was an illegal controlled substance. Tr. 7/30/25 at 174.



*Def Exhibit 6 Investigator Hinistroza's markings of where he allegedly saw the three men*

---

[2] Investigator Hinistroza was impeached with his testimony in the grand jury where he testified that Mr. Davis was smoking a cigarette that was "field tested for THC." GJ Testimony at 5. At the suppression hearing, the officer claimed that he was talking about the wax in Mr. Washington's possession. Tr. 7/30/25 at 169-70.

*standing*

Investigator Hinistroza described seeing three men standing, facing one another when he first observed them smoking. Tr. 7/30/25 at 125. Mr. Davis and Mr. Washington's sides were visible to him, with Mr. Davis facing the laundromat and Mr. Washington facing the street. Tr. 7/30/25 at 126-27. When he first saw them, they were engaged in conversation and "just standing." Tr. 7/30/25 at 128. He testified that he then saw Mr. Davis puff the cigarette andpass the cigarette to Mr. Washington, who puffed the cigarette and passed the cigarette to the third person who, too, puffed the cigarette. Tr. 7/30/25 at 128. Investigator Hinistroza saw each person puff the cigarette only one time. Tr. 7/30/25 at 128. After Mr. Davis passed the cigarette, Investigator Hinistroza did not see it returned to him. Tr. 7/30/25 at 129. The entire time the officers saw them, from the light on 22nd and Alabama Avenue until they came out of the car – the three men were in arm's length of each other. Tr. 7/30/25 at 129-130.

Investigator Hinistroza said that Mr. Davis was facing west the first time the person in white comes up and that Mr. Washington was standing in front of him. Tr. 7/30/25 at 166.



*Gov'ts Exh 2 at 7:33:32*



*Govt's Exh 2 at 7:33:38*



*Govt's Exh 2 at 7:33:53*

Government's Exhibit 2 is footage from a camera across the street from the location where Mr. Davis was standing.  The video shows that prior to 7:33:32, Mr. Davis is walking around putting an object to his mouth consistent with a cigarette.  But he is not stationery and he is not standing with two other men.  He first converges with the man in black but doesn't give him anything.  He then converges with the man in white for the first time at 7:33:38. Mr. Davis and the man in white, Mr. Washington, both stop and Mr. Davis hands something to Mr. Washington.  Neither Mr. Davis nor Mr. Washington hand anything to the third man, and the third man is never seen putting his hands to his mouth.

In short, Exhibit 2 contradicts almost all of Investigator Hinistroza's testimony about his observations about the three men.  The men were not standing together.  There were not three men smoking.  The cigarette was not passed between all three of them.[3]

Hinistroza and his partner both testified that based upon purportedly observing all three men puff and pass the cigarette, they determined that they had probable cause to arrest for public consumption prior to getting out of the car and therefore they immediately stopped the three men.  Tr. 7/30/25 at 83 ("So you're saying – well let me just establish that first.  So as soon as you get out of the car, these guys are stopped, you're saying?  Yes.").   When they did get out, they both claimed to smell marijuana.  Tr. 7/30/25 at 29 (Q: "You approach the individuals.  At this point, all you have seen is the smoke, right?  And then you smell it." A: "Yes, Your Honor." Tr. 7/30/25 at 29.).  On cross examination, the officer acknowledged that he did not tell Mr. Davis or otherwise voice his intention to arrest the three men.  Tr. 7/30/25 at 87.   He told Mr.

---

[3] Certainly the officers guessed that the three men were smoking marijuana, and filled in details with educated but blind guesses.  Surely, these officers often see men hanging out in a circle smoking.  Surely, these officers have often determined that men smoking a shared cigarette are smoking marijuana or something potentially illegal.  But the video demonstrates the extent to which the officers were relying on hunches and guesses rather than actual observations.

Davis to show his identification and "you'll be on your way."  Tr. 7/30/25 at 88.

The Court inquired as to the need to ask for identification.  He first explained that it was to benefit the citizen with whom he was making contact: "to establish first [] a connection with the people we interact to.  You now, we give them a right to actually have a conversation…. We actually engage, we communicate, we express, we let them know what it is and all those type of things.  And during that, we gather our information and then we determine, you know, the outcome of the scene."  Tr. 7/30/25 at 86. Moments later, Investigator Hinostroza changed his explanation: "I utilize the technique, hey, let me see your name, let me get your name, show me your ID, show me – do you have any proof of ID, please provide it to me, to wait for my backup to arrive."  Tr. 7/30/25 at 90.

The officer was confronted with bodyworn camera footage (BWC) that showed that he first told Mr. Davis that "he would be on [his] way" at 19:34:53, Tr. 7/30/25 at 95, and that 16 seconds later on the footage, at least five officers were on scene, Tr. 7/30/25 at 98.  Investigator Hinistroza also agreed that at that point, he had no belief that any of the men were actually dangerous or would flee.  Tr. 7/30/25 at 99.  The officer also admitted that despite his claim that officers decided that all three men were under arrest at that point, that one Investigator Had conducted a pat-down search instead of a full search incident to arrest. Tr. 7/30/25 at 101.  He further acknowledged that even though the full team had arrived and many officers were on the scene, none of the three men had been handcuffed or told they were under arrest.  Tr. 7/30/25 at 101.  He also agreed that the man in white, Mr. Washington, was allowed to walk around the scene.  Tr. 7/30/25 at 107.  He testified that Mr. Washington did so because there were only two officers.  But upon seeing the MPD camera footage, he conceded that Mr. Washington was allowed to walk freely, even at the time his whole unit had arrived.  Tr. 7/30/25 at 107-109.

Mr. Davis said to Investigator Hinistroza, "I wasn't smoking sir" and showed his empty hands. Hinistroza said he told both Mr. Davis and the man in white to stop and asked for proof of identification. Tr. 7/30/25 at 22.

Hinistroza testified that when he got out of the car, he and his partner were engaging with three individuals so he "utilized the technique" asking to see their identifications. Tr. 7/30/25 at 90.

Shortly thereafter, Investigator Hinistroza grabbed Mr. Davis' arm "because after engaging in conversation with him, he immediately start[ed] putting his hands in his pockets." Tr at 23. Investigator Hinistroza claimed that "for officer safety, and we just – I believed that he had something in there or he could have put through anything in that nature, you know, that is unsecure at that time, so that's when I grabbed his elbow." Tr. 7/30/25 at 23.

He continued:

> "So as he was looking through his phone for identification, he couldn't provide to me. And I gave him a reasonable amount of time for him to actually prove something. If he didn't have anything on his cell phone could have just told me, sir I don't have anything, but he keep browsing his cell phone.
> So during that time, you know, I said, you know what, sir, at this time we're going to detain you. And then Mr. Davis put his hand in his pocket. And I didn't like anybody to put hands in their pockets because I don't know what they have in their pockets. So that's when I grabbed his elbow.

Tr. 7/30/25 at 23-24

The Court then asked, "So he hadn't put his hands in his pocket, you said, 'I'm going to detain you,' and then he puts his hand in his pocket." The officer responded:

> Yes I don't know why he put his hand in his pocket but, you know, for officer safety, you know, we don't like when people actually reach into their pockets because we don't know why is the reason they're doing that if we're just looking for the ID.

Tr. 7/30/25 at 25.

The Court then asked the officer why he decided to detain Mr. Davis at that time. The

officer replied:

> Because I feel like he was a little evasive.  I feel like his body language was
> switching a little bit.  So, you know, just my awareness increase, and I started
> paying more attention to him and not paying too much attention to the guy on my
> right, who was Mr. Washington.
> …
> I started giving the reasonable amount of time for him to provide his information,
> he was just wandering and trying to look for something.  That's when I started
> saying, okay, so I think this is the time that I need to detain him, you know…. But
> during that time he reached into his pocket, and I didn't like him reaching into his
> pocket because I never frisk him, I never search him, I just trying to detain him,
> and I didn't like that part.  So that's why I grab his elbow, say "Hey stop reaching
> to your pocket" and I pulled somebody to assist me to placing the handcuffs.

Tr. 7/30/25 at 25-27.

The prosecution attempted to clarify, "why was it suspicious to you that he was reaching

into his pocket?", Hinostroza replied:

> Because we were just talking about his ID.  We're not talking about what do you
> have in your pockets.  We're not talking about show me what you have in your
> pockets.  We're not talking about anything else.  The only thing I was asking him
> is for his proof of identification.

Tr. 7/30/25 at 27.

The officer's bodyworn camera contradicts his account.

19:34:15 – Investigator Hinistroza first asks for the identification for all three men.

19:34:50 – Investigator Hinistroza says, "I just want to verify your over 21, make sure

you got no warrants and you'll be on your way.

19:34:58 – Mr. Washington produces identification.  Mr. Davis begins looking for

identification in phone

19:35:06 – Hinistroza instructs another officer to search Mr. Washington – "Make sure he

doesn't have anything illegal on him."

19:35:29 – Mr. Davis says, "I'm just saying sir, I got my id on the phone" (showing

Hinistroza phone).

19:35:43 – Investigator Hinistroza asks, "You got anything illegal on you?" Mr. Davis responds "No sir" and begins showing the officer what is in his pockets

19:35:44 – Investigator Hinistroza grabs Mr. Davis' arm and says, "just relax" while Mr. Davis is going through his pockets to show he had nothing illegal.

1935:50 – Investigator Hinistroza calls over another partner.

Investigator Hinistroza testified the grabbed Mr. Davis' arm and that Mr. Davis "tense[d] up" "started be very aggressive resistant" "tried to walk, away, he tried to flee. He tried to get free from us." Tr. 7/30/25 at 30. At that point, several other officers converged and a firearm was recovered from Mr. Davis. The officers testified that they searched for a marijuana cigarette but that none was found. Tr. 7/30/25 at 31. The body worn camera footage does not show Mr. Davis fleeing or trying to flee. Nor does the footage show a search for the unsmoked portion of the cigarette.

Investigator Hinistroza acknowledged that Judge Raffinan in D.C. Superior Court had found him to be incredible in 2017. He had testified in a suppression hearing and was found incredible as to his testimony about smelling marijuana. Tr. 7/30/25 at 72. He testified that he was not disciplined. He was also called to testify in 2024 before Judge DiToro in Superior Court. His testimony at a suppression was again found to not be credible. In particular, the judge did not believe his testimony about smelling marijuana in an stop for public consumption of marijuana while he was on the Robbery Suppression Team. Investigator Hinistroza testified that the Internal Affairs investigation was still pending into this 2024 conduct. Tr. 7/30/25 at 66.

## Argument

The Fourth Amendment ensures that individuals have the right to be free from "unreasonable searches and seizures." U.S. Const. amend. IV. The government proceeds on two

alternative theories here.  First, that Investigators Hinistroza and Desir had reasonable articulable suspicion to stop and frisk Mr. Davis.  And second, that they had probable cause to arrest Mr. Davis for public consumption of marijuana and that the search was incident to that arrest.

I.     Legal Background

"Under the Fourth Amendment, our society does not allow police officers to 'round up the usual suspects.'" *United States v. Castle*, 825 F.3d. 625, 629 (D.C. Cir 2016) (quoting *United States v. Laughrin*, 438 F.3d 1245, 1247 (10th Cir. 2006)).  Instead, police officers must have a reasonable, articulable suspicion that criminal activity is afoot before they may seize a person, even temporarily, in order to investigate a suspected offense.  *Terry v. Ohio*, 392 U.S. 1 (1968). That suspicion must go beyond an "inchoate and unparticularized suspicion, or 'hunch,'" *id.* at 27, and requires that the Investigator Has a "particularized and objective basis for suspecting the particular person stopped of criminal activity*." United States v. Cortez*, 449 U.S. 411, 417-18 (1981) (citations omitted).  Proving reasonable suspicion is the government's burden.  *Castle*, 825 F.3d. at 634 (D.C. Cir 2016).

Even if a stop is properly justified, that does not mean law enforcement can frisk the individual seized.  Instead, the police officer must have "reason to believe, based on specific and articulable facts, . . . that he is dealing with an armed and dangerous individual" in order to conduct a protective search of a suspect (also known as a *Terry* frisk).  *See United States v. Spinner*, 475 F.3d 356, 358 (D.C. Cir. 2007) (cleaned up); *United States v. Holmes*, 385 F.3d 786, 789 (D.C. Cir. 2004) (explaining that police may perform a protective frisk if he has reasonable suspicion that the individual is armed and dangerous).

Where an individual is arrested, the standard is higher.  The government must have probable cause.  *Mapp v. Ohio*, 367 U.S. 643 (1961).

II.    <u>Mr. Davis was seized far earlier than the government contends</u>

It is well established that a Fourth Amendment seizure occurs when (1) "physical force is used to restrain movement" or (2) "when a person submits to an officer's show of authority." *United States v. Delaney*, 955 F.3 1077, 1081-82 (D.C. Cir. 2020). A show of authority occurs when officer's actions are such that "a reasonable person would have believed that he was not free to leave." *United States v. Gross*, 784 F.3d 784, 787 (D.C. Cir. 2015). To answer this question, a court must consider "all the objective circumstances of the encounter," rather than examining individual facts in isolation. *United States v. Lewis*, 921 F.2d 1294, 1297 (D.C. Cir. 1990).

To begin, the officers testified that Mr. Davis was stopped as they approached him by car. Tr. 7/30/25 at 83 ("So you're saying – well let me just establish that first. So as soon as you get out of the car, these guys are stopped, you're saying? Yes."). At that point, because it is clear Mr. Davis did not have the ability to leave, he was seized.

The officer's subsequent actions further confirm the defendants, including Mr. Davis, were seized. Immediately upon exiting the vehicle, Investigator Hinistroza raised his hands up to Mr. Davis in a gesture indicating "stay where you are" and "be calm," and said, "just chill." Ex 1. at 19:34:09. This amounted to an order not to leave or make sudden movements, and Mr. Davis complied by staying in one place and not fleeing. *See, e.g.*, *United States v. Wood*, 981 F.2d 536, 540 (D.C. Cir. 1992) (officer made a show of authority when he told the defendant to "stop" and the defendant submitted when he stood in place and did not flee); *United States v. Meza-Diaz*, 881 F. Supp. 263, 264 (S.D. Tex. 1994) (concluding that gesture by officer followed by defendant stopping was a seizure).



PUBLIC_CONSUMPTION_-_2105_ALABAMA_AVE_SE at 19:34:09.

Investigator Hinistroza then proceed to cross the parking lot so he was standing directly in front of Mr. Davis, blocking his path. *See United States v. Veney*, 444 F. Supp. 3d 56, 64 (D.D.C. 2020), *aff'd*, 45 F.4th 403 (D.C. Cir. 2022) ("When Officer Torres stepped in front of Veney, his conduct constituted a 'show of authority' because a reasonable person would not feel free to leave when an officer blocks his path in that manner."). Again, because Mr. Davis did not flee, he submitted to that authority and was seized.

Both Investigators Hinistroza and Desire then made the "stay where you are" gesture in unison.



PUBLIC_CONSUMPTION_-_2105_ALABAMA_AVE_SE at 19:34:11.  Again, because Mr.

Davis did not flee but stayed put, this was a seizure.

     Even assuming those gestures were somehow not enough to constitute a show of

authority, however, Investigator Hinistroza's repeated demands for Mr. Davis's identification

certainly were.  Investigator Hinistroza, after stopping in front of Mr. Davis, said, "You got all

your three id?"  Ex 1 at 19:34:14.  Investigator Hinistroza then repeatedly demanded that

identification, using mandatory language: "I need your ID, sir."  "I need your ID too."  Ex 1 at

19:34:16-22.  And then seconds later, again, "I need your id.  Both of you."  Ex 1 at 19:34:38.

Investigator Hinistroza then expressly tied the Mr. Davis and the other men's ability to leave to

his request for identification:  "I just want to verify you're over twenty-one, make sure you got

no warrants and you'll be on your way."  Ex. 1. at 19:34:48.

     These demands for identification were a clear show of authority. "No seizure occurs

when police ask questions of an individual [and] ask to examine the individual's identification, *so long as the officers do not convey a message that compliance with their requests is required*." Fla. v. Bostick, 501 U.S. 429, 437 (1991) (emphasis added).  But "the very nature of a demand or command—as opposed to a mere question—is that compliance is mandatory."  *United States v. Gamble*, 77 F.4th 1041, 1045 (D.C. Cir. 2023).  Furthermore, questioning itself can involve into a show of authority if, by its nature, it "convey[s] a message that compliance with [the officer's] requests is required'" *United States v. Mabry*, 997 F.3d 1239, 1243-44 (D.C. Cir. 2021).

Here, Investigator Hinistroza demanded the identification in mandatory terms.  He did not say he wanted it or ask if he could have it.  Instead, said he "needed" it.  And then he expressly tied Mr. Davis and the other men's ability to leave to producing it.  No reasonable person would have felt free to leave under these circumstances until after complying with the officer's show of authority. [4]

Mr. Davis, for his part, submitted to this show of authority.  "[W]hat may amount to submission depends on what a person was doing before the show of authority: a fleeing man is not seized until he is physically overpowered, but one sitting in a chair may submit to authority by not getting up to run away." *Delaney*, 955 F.3d at 1084 (quoting *Brendlin v. California*, 551

---

[4] Although not necessary, other circumstances confirm the show of authority too.  In *United States v. Mabry*, the Court concluded the officers had made of authority where, onto of persistent questioning, the defendant had "seen the police prevent one of his associates from leaving and pat down both of them," and the defendant's "avenues of egress were at least partially restrited by the officers, their car, and a fence." 97 F.3d 1239, 1243-44 (D.C. Cir. 2021).  While Investigator Hinistroza was demanding Mr. Davis's identification, Investigator Desir began patting down the third individual.  Other officers soon approached the scene, further enclosing in Mr. Davis and preventing him from leaving.  Investigator Hinistroza then instructed another officer to "grab [Mr. Washington] real quick," Exh. A at 19:35:05, and the officer began frisking him.  *Id.* at 19:35:03-18.    The officers also accused Mr. Davis of "smoking" which told Mr. Davis that he could not walk away.  *Gross*, 784 F.3d at 788 (emphasis in original) ("direct *accusations* of criminal conduct by officers have weighed in favor of finding a seizure.").

U.S. 249, 262, 127 S.Ct. 2400, 168 L.Ed.2d 132 (2007)).  Notably, a defendant's submission to an officer's show of authority need not be perfect.  For example, in *United States v. Mabry*, 997 F.3d 1239 (D.C. Cir. 2021), the Circuit held that a defendant submitted to an officer's show of authority by remaining by a fence and lifting up his shirt even though he refused to comply with the officers' request that they be able to search his satchel.  *Id.* at 1246; *see also United States v. Gamble*, 77 F.4th 1041, 1047 (D.C. Cir. 2023) (Srinivasan, J., concurring) (explaining that defendant had submitted to authority "when he stays in place rather than leaves" even if he does not complied with "additional demands"); *United States v. Wright*, 57 F.4th 524, 532-33 (5th Cir. 2023) (defendant submitted to authority even though he did not fully comply with some of the officer's commands).  Here, Mr. Davis did not flee and attempted to comply with the Investigator Hinistroza's demand for his identification by looking through his phone.  Mr. Davis, at this point, was seized.

And, even if that were somehow not enough, Mr. Davis was seized when Investigator Hinistroza grabbed Mr. Davis at 19:35:44, about one minute and 45 seconds into the encounter. *See Castle*, 825 F.3d at 633 (concluding that the individual was seized when officer "touched" him on his arm, "instructed him to 'hold on,'" and the individual complied); *United States v. Johnson*, 365 F. Supp. 3d 89, 98 (D.D.C. 2019) (seizure began no later than the "moment of first physical contact").

III.    Mr. Davis's seizure was illegal

"It is the government's burden to provide evidence sufficient to support reasonable suspicion justifying any stop."  *United States v. Castle*, 825 F.3d. 625, 634 (D.C. Cir 2016) (citations omitted). The officers testified that they observed Mr. Davis publicly consuming marijuana, but the evidence presented by the government is not reliable and cannot support a

finding of reasonable suspicion.

        *1.  The officers' claims about their initial observations are unreliable*

        The officers' claim about their initial observations from the car of Mr. Davis smoking are unreliable, if not entirely incredible. The officers claim to have made their observations from a variation of 30 yards away (Hinistroza - Tr. 7/30/25 at 12), 50 yards away (Hinistroza - Tr. 7/30/25 at 47), 25-30 yards away (Desir - Tr. 8/5/25 at 177) and 70 yards away (anticipated defense testimony). The officers were not focused on a particular person, offense, or area. Yet, they claim to have seen from that indeterminate-but-considerable distance: 1) a white cigarette; 2) that visibly lacked a filter; 3) a cloud of smoke consistent with marijuana smoke and only marijuana smoke; 4) three individuals standing still; and 5) each individual puffing the cigarette once before passing it to the next. None of this is correct. The officer's claims are all contradicted by either common sense, the CCTV video, the defense pictures/body-worn camera images, or some combination thereof.

        **Cigarette color and filter:** To start, the officers' claim that they could see the color of the cigarette and the absence of a filter strains credulity. The officer's purported to see this information from approximately a pool length away. Respectfully, no one's eyes are that good. Plus, according to the officer's testimony, this cigarette was not just being held out for easy visibility. It would have been held in the fingers and the mouths of the people purportedly smoking it, which should have blocked much of the view of the cigarette, including where a filter would likely be. There simply is no way these officers could have clearly seen the color of the cigarette and the absence of the filter from this distance and under these circumstances.

        But even assuming the officers could somehow see that the cigarette was white and lacked an orange filter, that still does not establish reasonable suspicion. Investigator Desir

testified that the absence of an orange filter on a cigarette was important because cigarettes have "an orange filter for anybody who smoked a cigarette that's distinctive. This particular object didn't have that." Tr. 8/4/25 at 167. Cigarettes, however, do not come with orange filters only. They also come with white filters.



Investigator Desire, when confronted with this fact, doubled down: "Typically, a cigarette is going to have the orange filter." Tr. 8/4/25 at 167. But that is not true. Marlboro is the leading cigarette brand in the U.S. with 45.8% of the market share.[5]    And, although exact sales statistics are proprietary, the white-filtered Marlboro Gold appears to be one of the top selling Marlboro products.[6]

In conclusion, the cigarette's purported color and absence of an orange filter cannot support probable cause because: (1) it is not credible that the officer's observed them, and (2) even if they did, what they saw is not evidence that the cigarette was unlawful.

**Smoke:** The officers also claimed that they could the tell the cigarette was a marijuana cigarette from the cloud of smoke it emitted. In particular, Investigator Hinistroza testified that, from the bicycle sign where he first observed Mr. Davis, he was able to tell that the smoke was

---

[5] https://tobaccoinsider.com/us-cigarette-brands/
[6] https://pmc.ncbi.nlm.nih.gov/articles/PMC10700656/.

marijuana smoke. *See* Tr. 7/30/25 at 11. This is laughable and defies common sense. Investigator Hinistroza did not prevent any credible testimony about how had developed this novel ability to identify different types of smoke by sight, which is a first for defense counsel. And, although Investigator Desir first testified that marijuana and tobacco emit "two different types of cloud and smoke," Tr. 8/4/25 at 163, when pressed to explain the "cloud of smoke analysis," he relied upon the appearance of the cigarette itself, rather than the smoke. *Id.* at 166-67 ("Again, can see the object, which was a white, hand-rolled marijuana cigarette joint.").   In other words, this factor is at best redundant of the evidence the government had about the appearance of the cigarette itself.   Which, as noted, was not credibly observed by the officer and, even if it was, is not evidence of lawful conduct.

**The three individuals standing stationery and passing a cigarette:** Both investigators testified that they made their first observations of Mr. Davis when at the intersection of 22nd and Alabama Avenues from the patrol car.  Investigator Desir said that the three men were "standing together"," "loitering" and "congregating." Tr. 8/4/25 at 178-79.  Investigator Hinistroza testified they were "just standing" and "engaged in conversation" when he first saw Mr. Davis and Mr. Davis puffed the cigarette one time and passed it. Tr. 7/30/25 at 128.  Both officers also testified that Mr. Davis was facing them.  And they said all three men were passing the cigarette. *Id.* at 128; 8/4/25 at 182.

Exhibit 2 (the CCTV footage) conclusively demonstrates that the officers' testimony was false.  Mr. Davis is facing away from the officers, with his back toward the intersection of Alabama Avenue.  *Gov't Exh 2* at *7:33:32*

Furthermore, the contrary to the officers' testimony, Mr. Davis and the other two individuals he was with were not stationery as the officers said they were.  Instead, Mr. Davis is

19

engaged in conversation with one person – a man in black – when the man in white (Mr. Washington) appears from the left side of the screen. *Gov't Exh 2* at 7:33:34. Mr. Washington then walks up to them.

Finally, the men did not pass the cigarette between all three of them. The CCTV shows Mr. Davis taking one puff from the cigarette and handing it to Mr. Washington as they walked up to each other. *Govt's Exh 2 at 7:33:38*. But no one passed the cigarette to the third man, who never took a puff from the cigarette at all. *Gov't's Exh 2 at 7:33:53.*

### 2. *The officers' provided additional false statements under oath*

On top of this, the officers provided additional, transparently false statements under oath when defending their conduct. Investigator Hinistroza claimed that he asked for Mr. Davis' identification to stall for back up. Not true. Back-up was there within seconds, *prior* to him repeating his request for identification. Investigator Hinistroza claimed that Mr. Davis was "refusing" to provide identification. Again, false. Mr. Davis was continuously searching for his ID and told Investigator Hinistroza it was on his phone. Investigator Hinistroza said that he needed to search Mr. Davis because Mr. Davis went to his pockets without any reason or cause. But Investigator Hinistroza admitting that he had just asked Mr. Davis if he had anything illegal on him. It is perfectly natural, and not an indication of wrongdoing, for someone to go for their pockets in response to that question to show they have nothing unlawful on them. Finally, Investigator Hinistroza said that the man in white (Mr. Washington) was allowed to wander around because there were not many officers present. False again. CCTV video showed his entire team on the scene during that period.

### 3. *The officer's credibility is further undermined by prior findings of falsity and their reasons for bias*

The Court can find Investigator Hinistroza incredible based purely on his testimony

before this Court,  However, additional evidence confirms what his testimony before here demonstrates: Investigator Hinistroza is not a reliable witness.  To begin with, Hinistroza has not been found to be incredible twice by impartial judges.  Not just that, but both times have been at suppression hearings involving allegations by him of public consumption of marijuana—in other words, under just these circumstances.

Investigator Hinistroza's testimony is also marred by the fact that he is currently pending discipline by Internal Affairs because he was found to have lied in a recent suppression hearing. Furthermore, both Investigators Hinistroza and Desir are pending discipline after a Merits Board determined that they harassed a citizen in illegally seizing him and searching him in violation of the Fourth Amendment while working on the Robbery Crime Suppression Team.  Both officers made statements to the Office of Police Complaints.  Both officers were deemed to make untruthful statements the Office of Police Complaints conducted its investigation.[7]  Both officers are awaiting disciplinary action from the MPD for their conduct.  These bad acts are relevant to demonstrate these officers' conduct, credibility, and bias.

The reason for bias is simple.  In order to curry favor with the U.S. Attorney's office and MPD, who have discretion over their punishments and any future criminal liability, they have every reason to testify in this case and in any other pending case that their actions were

---

[7] The government continues to refuse to provide the source materials from the harassment complaint – that is the BWC footage from the incident, the officers' recorded statements about the incident and all relevant information that shows the officers' bias and propensity towards making statements contradicted by physical evidence.  The government takes a step further by moving to quash a subpoena made to MPD (not represented by the U.S. Attorney's office and thus without standing), for emails in the officers' possession.  At the suppression hearing, both officers took advantage of the defense's inability to refresh or confront the officers about the investigation.  See e.g. Tr. 8/5/25 ("Again, I would have to look at the file.  I don't have the file."); Tr. 8/4/25 ("I don't remember.  I would need to check my email.  I don't remember…. I know I have pendings but I don't have anything specific that I know…. Probably one or two [pendings].  I don't remember how many.  Sometimes OPC, when they make complaints, they don't immediately notify you.").

consistent with the Fourth Amendment and MPD's rules and procedures. The officers acknowledged that the punishments increase in severity with additional violations. Tr. 8/4/25 at 40-41. The substance and severity of their past misconduct, as well as the discipline inflicted because of past misconduct (for example, Desir's 15-day suspension without pay, Tr. 8/5/25 at 21) are thus both entirely relevant to the Court's consideration of their credibility.

> 4.  The officer's purported observations once they left the vehicle are irrelevant, and do not contribute to the reasonable suspicion calculus.

Smell of marijuana

Blading body

Walking away

Reaching into pockets.


IV.   <u>Mr. Davis's search was illegal</u>

Even assuming Mr. Davis's seizure was somehow legal, the search of Mr. Davis was not. A officer may not frisk a defendant unless he has reasonable suspicion to believe the individual is armed and dangerous. *United States v. Holmes*, 385 F.3d 786, 789 (D.C. Cir. 2004) (quoting *Terry v. Ohio*, 392 U.S. 21, 27 (1968). For some offenses, the reasonable suspicion to believe the defendant committed the offense is enough. For example, a defendant reasonably suspected of committing assault with a deadly weapon can be presumed to be armed and dangerous. *United States v. Bullock*, 510 F.3d 342, 346 (D.C. Cir. 2007). So can someone reasonably suspected of murder. *Id.* Some drug trafficking offenses may even qualify. *Id.*

But the same cannot be said for simple drug possession or use, particularly when that drug is legal under local law. No one would say you can presume someone drinking beer out of

a red solo cup outside a store is armed and dangerous. The same logic applies to marijuana use, especially in Washington, DC.

The case law bears out what common sense suggests. Most notably, in *Sibron v. New York*, 392 U.S. 40 (1968), the Supreme Court held that an officer was not justified in frisking a defendant who was suspected of cocaine use into his pocket because the officer did not have reasonable suspicion to believe that individual was armed and dangerous. *Id.* at 64. Indeed, in that case, like here, the defendant was seen reaching into his pocket but the court held that C

Likewise, in *Upshur v. United States*, 716 A.2d 981 (D.C. 1998), the D.C. Court of Appeals held that officer's suspicion that the defendant had exchanged drugs for money did not give him reasonable suspicion to believe he was armed and dangerous. *Id.* at 984; *see also Ramirez v. City of Buena Par*k, 560 F.3d 1012, 1022 (9th Cir. 2009) ("Being "testy" and suspected of illicit drug use does not support a finding that Ramirez had a weapon."); *United States v. Garcia*, No. CR 12-1488 RB, 2012 WL 13076569, at *6 (D.N.M. Sept. 21, 2012) ("The Court concurs that mere knowledge of an individual's drug use, without more, cannot provide reasonable justification to believe that the person is armed with a syringe or any other type of weapon.").

Investigator Hinistroza attempted to suggests that Mr. Davis's reaching into his pockets was suspicious. But he never testified he thought he was armed and dangerous. And, as discussed at length above, Investigator Hinistroza's testimony on this topic was not credible in any event. First, he claimed that he was on elevated alert because Mr. Davis had reached into his pockets. He falsely stated that "after engaging in conversation with [Mr. Davis], he immediately start putting his hands in his pockets." Tr. 7/30/25 at 23. He purportedly found this suspicious "Because we were just talking about his ID. We're not talking about what do you have in your

pockets.  We're not talking about show me what you have in your pockets." Tr. 7/30/25 at 27.
This could not be further from the truth.  Mr. Davis and the officer were *not* talking about his ID.
Investigator Hinistroza asked, "Do you have anything illegal on you?" and Mr. Davis said no and
turned out his pockets to show Hinistroza that they were empty.    Indeed, he is not the only one
to have responded in this fashion.  Mr. Washington can be seen XXX>

At the point of the police's show of authority, Mr. Davis was not doing "anything
aggressive or warranting any additional force."  Tr. 8/4/25 at 198; Def. Exh 14 at 19:35:48. He
agreed that  nothing suspicious or aggressive had been done by 19:35:44 in the footage on
Defense Exhibit 2.  Desir identified the first suspicious action s starting at 19:35:58 after he has
been grabbed and told he would be put in handcuffs.

In contrast, Investigator Hinistroza testified that he was suspicious earlier but his
testimony raised significant questions about his reliability.  First, he claimed that he was on
elevated alert because Mr. Davis had reached into his pockets.  He falsely stated: "because after
engaging in conversation with him, he immediately start putting his hands in his pockets."  Tr.
7/30/25 at 23.  He justified his suspicion by the context of the conversation: "Because we were
just talking about his ID.  We're not talking about what do you have in your pockets.  We're not
talking about show me what you have in your pockets." Tr. 7/30/25 at 27.  But this testimony
was incorrect and could not be further from the truth.  They were *not* talking about his ID.  The
Investigator Had asked specifically what Mr. Davis was carrying.  Mr. Davis had reached into
his pockets in response to Investigator Hinistroza asking, "Do you have anything illegal on
you?"  Mr. Davis said no and turned out his pockets to show Hinistroza that they were empty.

The officers claimed they intended to arrest Mr. Davis and the other two men before leaving the police car. Tr. 7/30/25 at 83. But, once they left the car, the offices did nothing to consistent with this.

Investigator Hinistroza told Mr. Davis he would send him on his way if he produced identification. That is obviously inconsistent with an arrest. The officers made no effort to look for the marijuana cigarette or any other evidence of the crime they purportedly planned to arrest Mr. Davis for, as one would have expected. The officers did not seize the three individuals, as one would to do when making an arrest, and instead allowed at least one to walk around. Finally, the officers conducted pat down searches of the exterior of the clothing of the men, rather than searches incident to arrest which would allow them to go into the men's pockets. It makes no sense for an officer who is arresting someone to perform a less thorough search. Indeed, for safety reasons it is important to go through a defendant's pockets when that arresting them. However, the officers here did not do that until they felt the firearm on Mr. Davis's person. That is because, until they felt the firearm, they simply were not planning to arrest him.

It is plain that these officers made up this post-hoc justification in an attempt to save their illegal search. This Court should not indulge it. XXX. If it does so, it should hold that the officer's lacked probable cause.

V.    <u>The officers lacked probable cause to believe that Mr. Davis committed a crime.</u>

The officers testified that Mr. Davis was publicly consuming marijuana, but the evidence presented by the government was entirely unreliable.

*1. The officers' claims about their initial observations are unreliable*

The officers' claim about their initial observations from the car are unreliable, if not entirely incredible.  They claim to have made their observations from a variation of 30 yards away (Hinistroza - Tr. 7/30/25 at 12), 50 yards away (Hinistroza - Tr. 7/30/25 at 47), 25-30 yards away (Desir - Tr. 8/5/25 at 177) and 70 yards away (anticipated defense testimony).  The officers were not focused on a particular person, offense, or area.  Yet, they claim to have seen from that indeterminate-but-considerable distance: 1) a white cigarette; 2) that visibly lacked a filter; 3) a cloud of smoke consistent with marijuana smoke and only marijuana smoke; 4) three individuals standing still; and 5) each individual puffing the cigarette once before passing it to the next. None of this is correct.  The officer's claims are all contradicted by either common sense, the CCTV video, the defense pictures/body-worn camera images, or some combination thereof.

    *a.  This does not add up to probable cause*

To be clear, the government may have established probable cause that the officers observed Mr. Davis smoking **something**, but their evidence falls well short of demonstrating probable cause that Mr. Davis was doing **something illegal**.  His actions, standing and smoking, and even sharing a cigarette are perfectly consistent with legal behavior.  Whether the officers' hunch made sense to them, proved correct or was even made honestly, is of no moment because "the probable cause test is an objective one":

> We may assume that the officers acted in good faith in arresting the petitioner. But 'good faith' on the part of the arresting officer is not enough…. If subjective good faith alone were the test, the protections of the Fourth Amendment would evaporate, and the people would be "secure in their persons, houses, papers and effects" only in the discretion of police.

*LaFave, Wayne*, Search and Seizure Vol. 5, §3.2(b) at 42.

Using objective facts, the Court is required to reject the government's probable cause presentation.  The Court can make an objective determination of the officers' ability to perceive anything at a significant distance, including something as fleeting as a puff of smoke.  The Court

also has, at its disposal, the array of inaccurate facts reported by the officers, because of Exhibit B. Exhibit B demonstrates that whatever it is that the officers saw, it was not what they reported that they saw.  They were simply not in the position to make those observations and replaced the gaps with assumptions that proved to be untrue.

The government's burden is made even more difficult because of the quality of witness' that delivered testimony proven wrong by the CCTV video.  Investigator Hinistroza has not only been found to be incredible twice by impartial judges, both times have been at suppression hearings involving his allegation of public consumption of marijuana.  His testimony was also marred by the fact that he is currently pending discipline by Internal Affairs because he was found to have lied in a recent suppression hearing.  Hinistroza's bad acts are relevant to demonstrate his conduct, his credibility and his bias.

> One way of discrediting the witness is to introduce evidence of a prior criminal conviction of that witness.  By so doing the cross-examiner intends to afford the jury a basis to infer that witness' character is such that he would be less likely than the average trustworthy citizen to be truthful in his testimony.  The introduction of evidence of a prior crime is thus a general attack on the credibility of the witness.  A more particular attack on the witness' credibility is effected by means of cross-examination toward revealing possible biases, prejudices, or ulterior motives of the witness as they may relate irectly to issues or personalities in the case at hand.  The partiality of a witness is subject to exploration at trial, and is 'always relevant as discrediting the witness and affecting the weight of his testimony." 3A J.Wigmore Evidence §940, p.775 (Chadbourn rev. 1970).  We have recognized that the exposure of a witness' motivation in testifying is a proper and important function of the constitutionally protected right of cross-examination.

*Davis v. Alaska*, 415 U.S. 308, 316-317 (1974).

The bias elicited in this hearing is straightforward.  Investigators Hinistroza and Desir are pending discipline after a Merits Board determined that they harassed a citizen in illegally seizing him and searching him in violation of the Fourth Amendment while working on the Robbery Crime Suppression Team.  Both officers made statements to the Office of Police

Complaints.  Both officers were deemed to make untruthful statements the Office of Police

Complaints conducted its investigation.[8]  Both officers are awaiting disciplinary action from the

MPD for their conduct in that case.  Both officers thus have a motive to curry favor with the U.S.

Attorney's Office and with MPD.  They are motivated to testify that their actions are consistent

with the Fourth Amendment and MPD's rules and procedures to limit the punishment they will

undoubtedly receive.  The officers also acknowledged that the punishments increase in severity

with additional violations.  Tr. 8/4/25 at 40-41.  The substance and severity of their past

misconduct, as well as the discipline inflicted because of past misconduct (for example, Desir's

15 day suspension without pay, Tr. 8/5/25 at 21) are thus both entirely relevant to the Court's

consideration of their credibility.

VI.    The officers did not have independent reasonable articulable suspicion to stop Mr.
       Davis

    "It is the government's burden to provide evidence sufficient to support reasonable

suspicion justifying any stop."  *United States v. Castle*, 825 F.3d. 625, 634 (D.C. Cir 2016)

(citations omitted).  Although the interaction with Mr. Davis constituted a seizure, the officers

also did not have sufficient cause to conduct a stop and frisk without violating Mr. Davis'

constitutional and/or statutory rights. "Under *Terry*, and its progeny, a police officer may

---

[8] The government continues to refuse to provide the source materials from the harassment complaint – that is the bodyworn camera footage from the incident, the officers' recorded statements about the incident and all relevant information that shows the officers' bias and propensity towards making statements contradicted by physical evidence.  The government takes a step further by moving to quash a subpoena made to MPD (not represented by the U.S. Attorney's office and thus without standing), for emails in the officers' possession.  At the suppression hearing, both officers took advantage of the defense's inability to refresh or confront the officers about the investigation.  See e.g. Tr. 8/5/25 ("Again, I would have to look at the file.  I don't have the file."); Tr. 8/4/25 ("I don't remember.  I would need to check my email.  I don't remember…. I know I have pendings but I don't have anything specific that I know…. Probably one or two [pendings].  I don't remember how many.  Sometimes OPC, when they make complaints, they don't immediately notify you.").

perform a protective frisk if he has reason to believe, based on 'specific and articulable facts …

taken together with rational inferences from those facts,' that 'he is dealing with an armed and

dangerous individual.'" *United States v. Holmes*, 385 F.3d 786, 789 (D.C. Cir. 2004) (quoting

*Terry v. Ohio*, 392 U.S. 21, 27 (1968). Here, the officers did not have even arguable reasonable

articulable suspicion that Mr. Davis was armed until the police stopped him.

      To begin, the officers testified that Mr. Davis was stopped as they approached him by car.

Tr. 7/30/25 at 83 ("So you're saying – well let me just establish that first.  So as soon as you get

out of the car, these guys are stopped, you're saying?  Yes.").  Thus, at that point, the officers

would have had to had reasonable articulable suspicion that Mr. Davis was committing a crime

to legally stop him.  Having failed to do so, they violated his Fourth Amendment rights.

      The government contends that Mr. Davis was not stopped until officers conducted a pat-

down search and discovered the firearm.  The assertion is contrary to Supreme Court and D.C.

Circuit precedent in light of the facts of the case.  It is well established that a "Fourth

Amendment seizure occurs when physical force is used to restrain movement or when a person

submits to an officer's show of authority."  *United States v. Delaney*, 955 F.3 1077, 1081-82

(D.C. Cir. 2020).  While Investigator Hinistroza forcefully grabs Mr. Davis at 19:35:44, about

one minute and 45 seconds into the encounter, the officers' show of authority established that

Mr. Davis was seized much earlier.

      *United States v. Mabry*, confronted a similar situation that is presented to this Court.  997

F.3d 1239, 1243-44 (D.C. Cir. 2021).  *Mabry* pointed out that officers' "questioning can evolve

into a show of authority if they 'convey a message that compliance with their requests is

required'" … and "[t]hat is precisely what happened here."  *Id.* at 1244.  The Circuit pointed out

that the defendant had "already seen the police prevent one of his associates from leaving and pat

down both of them." The "persistent nature" of the officers' questioning showed him that he was "not taking no for an answer." *Id.* The defendant's "avenues of egress were at least partially restrited by the officers, their car, and a fence." *Id.* Noting Circuit precedent that relied significantly on where officers had parked their cruisers in relation to the defendant's car, the court concluded that a reasonable person would not have felt free to ignore the officer and walk away.

Mr. Davis was presented with similar, if not stronger indicia that he could not walk away. Immediately, Investigator Hinistroza raises his hands up to Mr. Davis and said, "Just chill," an order not to move, leave or make sudden movements. Exh 1. At 19:34:09. He then says, "You got all your three id?" while Investigator Desir is simultaneously stopping the third individual in black. Within 20 seconds, Desir is patting down the third individual and other officers are approaching the scene, further enclosing in Mr. Davis and preventing him from leaving.

The officer persists with mandatory language: "I need your id. Both of you." Exh 1 at 19:34:38. He then instructed, "I just want to verify you're over twenty-one, make sure you got no warrants and you'll be on your way." Exh 1. at 19:34:48. Investigator Hinistroza is clearly conditioning Mr. Davis' ability to leave by showing his identification – in other words, Mr. Davis was not permitted to leave. Recognizing this, Mr. Davis, as well as Mr. Washington search for their identifications in hopes they would be permitted to leave. Exh. A at 19:34:56. Investigator Hinistroza then instructed another officer to "grab [Mr. Washington] real quick." Exh. A at 19:35:05.

Though it is clear that Mr. Davis did not have the ability to leave as soon as the officers approached him, the demand for his identification left no doubt that Mr. Davis was not permitted to leave. The officers also accused Mr. Davis of "smoking" which told Mr. Davis that he could

not walk away.

At the point of the police's show of authority, Mr. Davis was not doing "anything aggressive or warranting any additional force." Tr. 8/4/25 at 198; Def. Exh 14 at 19:35:48. He agreed that nothing suspicious or aggressive had been done by 19:35:44 in the footage on Defense Exhibit 2. Desir identified the first suspicious action s starting at 19:35:58 after he has been grabbed and told he would be put in handcuffs.

In contrast, Investigator Hinistroza testified that he was suspicious earlier but his testimony raised significant questions about his reliability. First, he claimed that he was on elevated alert because Mr. Davis had reached into his pockets. He falsely stated: "because after engaging in conversation with him, he immediately start putting his hands in his pockets." Tr. 7/30/25 at 23. He justified his suspicion by the context of the conversation: "Because we were just talking about his ID. We're not talking about what do you have in your pockets. We're not talking about show me what you have in your pockets." Tr. 7/30/25 at 27. But this testimony was incorrect and could not be further from the truth. They were *not* talking about his ID. The Investigator Had asked specifically what Mr. Davis was carrying. Mr. Davis had reached into his pockets in response to Investigator Hinistroza asking, "Do you have anything illegal on you?" Mr. Davis said no and turned out his pockets to show Hinistroza that they were empty.

<u>**Conclusion**</u>

For the reasons set forth above, and for such other reasons as this Court may determine at a hearing on this motion, Mr. Davis respectfully requests that this motion be granted and that the Court suppress the use as evidence of all items seized on May 19, 2025.

Respectfully submitted,

A. J. KRAMER
FEDERAL PUBLIC DEFENDER

     /s/

_____
EUGENE OHM
Assistant Federal Public Defender
625 Indiana Avenue, N.W., Suite 550
Washington, D.C.  20004
(202) 208-7500